## HALIBUT PRODUCERS COOPERATIVE v. PORTER, Price Administrator.
### No. 290.

United States Emergency Court of Appeals.

Heard at Seattle, Wash., April 22, 1946.
Decided Sept. 11, 1946.

Albert Olsen, of Spokane, for complainant.

Josephine H. Klein, Atty., Office of Price Administration, of Washington, D. C. (Richard H. Field, Gen. Counsel, and Jacob D. Hyman, Associate Gen. Counsel, both of the Office of Price Administration, both of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and McALLISTER, and LAWS, Judges.

McALLISTER, Judge.

Complainant filed a protest against the provisions of Maximum Price Regulation 203,[1] which relates to the pricing of Vitamin A, claiming that they were invalid on the ground that they were arbitrary, capricious, and contrary to law. The Administrator denied the protest, and the present complaint was thereafter filed.

Complainant is a corporation, organized as a cooperative under the laws of the State of Washington. Its members consist of 276 manager owners, or part owners, of fishing vessels, operating in the Pacific Ocean, out of the Puget Sound area. The principal business of the complainant, conducted under the name of the "Halibut Liver Oil Producers," consists of handling fish livers taken from fish caught by its members, extracting the oil therefrom, and marketing the natural oils, which are primarily valuable for their Vitamin A con-

[1] In Vitamins, Inc. v. Bowles, Em.App., 1945, 149 F.2d 497, we had occasion to discuss the regulation in a somewhat similar case, where the proofs, however, differed from those in the present controversy.

tent. The Vitamin A produced by complainant comprises about 25% of all Vitamin A, produced from livers of fish caught by vessel owners in this country. Price Regulation 203 purports to fix the maximum price at which Vitamin A in natural oil can be sold.

Vitamin A is a unique commodity. It is a colorless substance having a chemical structure consisting essentially of a half molecule of beta-carotene. There has as yet been no commercial process developed by which it can be produced synthetically. The most important source of Vitamin A is the oil obtained from the livers of several species of fish and marine animals. The vitamin bearing oil obtained from such livers, serves as a vehicle for the handling and use of the vitamin. Fish liver oils containing Vitamin A are not sold as oils, but as Vitamin A, and such oils are quoted, bought, and sold, at a given price per million units of Vitamin A contained in a certain quantity of such oil, rather than at a certain price per gallon of oil.

The purpose of all methods of production is to extract the vitamin rather than the oil from fish and marine animals. The oil itself can be obtained relatively easily, but each of the various methods in use has as its major purpose insuring as little loss of vitamin potency as possible. The vitamin bearing oil is removed primarily from fish livers, by mechanical, thermal, or chemical action, which breaks down the liver tissue. The oil may be concentrated—in potency of vitamin content—by certain processes. But not all of the vitamin bearing oil goes through the concentrating process. Potency depends upon the kind of livers from which the oil is extracted, as well as upon the method of extraction, and concentration. Much natural Vitamin A oil is available for "end use" in its natural form. It appears that only oil in the extremely low potencies, or oil with offensive odor and taste, and poor stability, is *required* to be concentrated. However, much good quality oil is concentrated to satisfy the requirements of purchasers. Complainant in this case, as has been said, is also engaged in extracting the oil from the livers, but does not have any concentrating facilities. The

important point is that, in all oils, the Vitamin A is the same. There is no difference in its quality. The only difference is that the vitamin may be associated with a different quantity or kind of oil.

Before the price control statute, Vitamin A was priced, bought, and sold, according to the millions of units of the vitamin itself, without any regard to the potency of the oil, i. e. the proportion of units of vitamin to quantity of oil.

Price Regulation 203, adopted in August 1942, originally established three different ceiling prices based upon Vitamin A density, or potency of oil in which it was contained. According to its provisions, Vitamin A in oils having a potency of from 6,000 to 60,000 units per gram, had a ceiling price of 14 cents per million units; Vitamin A in oils having a potency of 60,000 to 200,000 units per gram, had a ceiling price of 20 cents per million units; and Vitamin A *concentrates* of any potency, and Vitamin A in natural oil with a potency in excess of 200,000 units per gram, had a ceiling of 30 cents per million units. Oils of potencies lower than 6,000 units per gram were excluded from the coverage of the Regulation.

After the Regulation had been in effect for some time, the Administrator found that the new price schedule had the result of encouraging the blending of the natural vitamin oils of different potencies, and the blending of natural vitamin oils with concentrated vitamin oils to create blends of just under 6,000 units per gram, and just at or over 60,000 and 200,000 units per gram. Based upon his finding that natural oils of other potencies, badly needed by pharmaceutical companies and other users were being held and used for blending and mixing, and were accordingly tending to disappear from the market, the Administrator issued Amendment No. 1 to the Regulation (9 F.R. 1036) on January 26, 1944. This amendment removed the exemption from control of vitamin oil of less potency than 6,000 units of Vitamin A per gram, except when used with Vitamin D in blending of oils for animal and poultry feeds, and established a maximum price of 14 cents per million units for any oil with a

potency of less than 40,000 units of Vitamin A per gram. The maximum price per million units of oils of potencies between 40,000 and 200,000 units of Vitamin A per gram, was fixed at 14 cents plus an additional one cent for each additional 1,000 units per gram. The maximum price of Vitamin A concentrates remained at 30 cents per million units, regardless of potency; and "concentrate" was defined as including any oil with a potency greater than 200,000 units of Vitamin A per gram.

After the above amended provision had been in effect for approximately six months, the Administrator found, in effect, that the result was that a practice had arisen of blending Vitamin A oils priced at 30 cents per million units, and having potencies above 200,000 Vitamin A units per gram, with lower priced oils, having potencies below 200,000 per gram, to create blends of a potency of 200,000 units or more, all of the oil in such a blend, selling for the maximum price of 30 cents per million units.

In order to end the above practice, the Administrator on July 19, 1944, issued Amendment No. 2 to the Regulation (9 F. R. 8188). In this amendment, it is provided that no blends of concentrates and natural oils shall be sold unless, prior to the sale, a specific maximum price is authorized for such sale by the Office of Price Administration, and that in no event will a maximum price be approved in excess of the amount which the components of the blend would be entitled to, if sold separately. Amendment No. 2 further provided that in cases in which it is determined that the blending will lead to circumvention and evasion of the Regulation, a maximum price may be established for the blend lower than the sum of the maximum prices of the components. In the amendment, the prior graduated scale of maximum prices for oils of potencies between 40,000 and 200,000 units of Vitamin A per gram, and the maximum price of 30 cents per million units for all concentrates were retained.

In fixing the prices for the different classes of Vitamin A, according to potency of the oil, the Administrator, in his Statement of Considerations, recited that, usually, "the less oil there is, the higher is the price," and "that potency is one major test of quality;" and throughout these proceedings, the Administrator and his counsel seek to justify the price differentiations based on differences of units of vitamin per gram, on the ground that there has always been a broad correlation between potency and quality, and between potency and price.

Complainant filed its protest against the provisions of the Regulation on several grounds. Those which affect our determination of the controversy may be stated as follows: that the Regulation falls within the restriction of Section 2(j) (4) of the Price Control Act, 50 U.S.C.A. Appendix, § 902(j) (4), which provides:

"Nothing in this Act shall be construed * * * as authorizing any order of the Administrator fixing maximum prices for different kinds, classes, or types of a commodity which are described in terms of specifications or standards, unless such specifications or standards were, prior to such order, in general use in the trade or industry affected, or have previously been promulgated and their use lawfully required by another Government agency."

Using the above provision as a basis for its protest, complainant, in effect, says that, assuming that the sales units of the vitamins (units per gram rather than weight or volume), and the description of the commodity (in terms of potency), are to be understood as "specifications or standards," in general use in the industry prior to price control—within the meaning of Section 2(j) (4) of the Price Control Act —then, the provisions of the Regulation fixing maximum prices for the different classes of Vitamin A, on the basis of potency, are arbitrary, capricious, and contrary to law.

In support of its contention, and in direct contradiction to the findings of the Administrator as set forth in his Statement of Considerations, complainant submitted, as evidence, affidavits to the effect that there was no relationship, and had never been any, prior to price control, between potency, and price, and quality, but that prices were based upon the number of

units of vitamins sold, rather than the potency of the oils in which they were contained, and, further, that the price depended also upon quality—that is, odor, taste, and stability of the vitamin oil. This claim does not apply to the extremely low potency oil, which was used in cattle feed, but does apply to all oils above that category, known as the medium and high potency oils.

Complainant's first affidavit is that of Lyle Branchflower, manager and sales representative of the Halibut Liver Oils Division of the complainant company. Prior to the organization of the cooperative, Mr. Branchflower had handled fish livers produced by vessel owners, extracted the oil therefrom, and marketed the Vitamin A natural oil. He stated that quality specifications for "end use" were, first, stability; and, second, color, flavor, and odor. Further he deposed that the sales records of complainant and its predecessor, prior to the adoption of Maximum Price Regulation 203, did not indicate that potency was the controlling factor on price, and that the lists of sales by the complainant during the period prior to the adoption of the Regulation show that there was no established practice of pricing Vitamin A on the basis of the vitamin potency of the particular oil. In conclusion, he unqualifiedly declared that "potency has no relation to odor, taste, and stability." In addition to the foregoing, complainant filed in evidence, the affidavit of John R. Costanza, president of the Vitamerican Oil Corporation of New Jersey, in which it was stated that "the value of Vitamin A was controlled largely by the quality of the carrier oil, in relation to the end use to which it was applicable. *Potency was not the*

*dominant factor in determining value.* It was but one of the several chemical and physical characteristics which determined utility, hence, value."

As a part of its proofs, complainant further introduced in evidence affidavits setting forth figures and prices of sales by itself and also by the Washington Laboratories, a company engaged in a business similar to that of complainant, but not in any way related to, or associated with it. This list of sales in substantial amounts, during November and December of 1941, and February, March, and April of 1942, disclose no correlation between the potency of the oil and the price that was paid. For instance, on February 17, 1942, soupfin shark liver oil with a potency of 115,600 units of Vitamin A to the gram sold at 27½ cents per million. The next day, a sale of soupfin shark liver oil with a potency of 86,200 units sold at 26½ cents per million. On March 6, halibut liver oil with a potency of 29,520 units sold at 22 cents per million units, and on the same day soupfin shark liver oil with a potency of 123,200 units sold at 22 cents per million units. Other listed sales are to the same effect.[2] Absolutely no correlation between potency and price appears from the foregoing, but rather the proof is persuasive that there was no such relationship. The explanation of this situation is found in Mr. Branchflower's affidavit in which he states: "For the several years prior to 1942, the species of fish from which the Vitamin A oil was obtained, was of, perhaps, greatest import. Halibut liver oil, regardless of potency, demanded a greater price per million units than any other type of fish liver oil. Vitamin A in Ling cod and black cod liver oils likewise sold at

---

[2] Following are additional sales, with potencies and prices, as evidenced by complainant's proofs:

| Date—1942 | | Kind of liver oil | Potency | Price |
|---|---|---|---|---|
| March | 7 | Soupfin shark | 145400 | 25 cents per million |
| March | 8 | Halibut | 94400 | 22 cents per million |
| March | 10 | Soupfin shark | 140200 | 20 cents per million |
| March | 16 | Soupfin shark | 82700 | 20 cents per million |
| March | 16 | Soupfin shark | 152500 | 20 cents per million |
| March | 17 | Mixed cod | 39800 | 20 cents per million |
| March | 17 | Ling cod | 92800 | 20 cents per million |
| April | 8 | Ling cod | 272000 | 22 cents per million |
| April | 9 | Black cod | 118200 | 22 cents per million |

higher prices per million units than Vitamin A in any of the shark liver oils of equal or greater potency."

The only evidence introduced on behalf of the Administrator was the affidavit of Robert Deupree, head of the Drugs, Soaps, and Cosmetics Section of the Rubber, Chemicals, and Drugs Price Branch of the Office of Price Administration, who stated that on the basis of a thorough study on his part of the Vitamin A industry and its practices, and extensive contacts with members of such industry and a review of the files of the Office of Price Administration immediately prior to the execution of his affidavit on May 30, 1945, he declared that prior to the issuance of the Regulation, Vitamin A natural oils were generally bought and sold on the basis of their potency. He further stated that prices for natural oils varied with the potency thereof; that in his opinion, adoption in the regulation of a scale of maximum prices for natural Vitamin A oils graduated according to potency is in accord with the practice generally prevailing in the industry prior to the issuance of the Regulation; and that there is a broad correlation between potency and quality of oil, the higher potency oils generally having better tastes and odors and more stability.

■ Findings set forth by the Administrator in his Statement of Considerations are prima facie correct, but such presumption falls, upon the introduction of evidence to the contrary. Here, all of the evidence of complainant was specific, supported by exact references to actual experience, and squarely contradicted the declarations of fact in the Statement of Considerations. We are of the opinion that complainant's evidence overcame the presumption of correctness that attaches to the Administrator's Statement of Considerations.

■ With regard to the evidence of the Deupree affidavit introduced on behalf of the Administrator, the actual facts set forth therein are so meagre, the statements so dependent on the authority of others, and the conclusions so general, as well as unsupported by instances of sales or any data that might be persuasive in case of dispute, that we can not consider that it partakes of the nature of evidence to support the Administrator's contentions that potency of the vitamin oil was a major test of quality, and that there was a correlation between potency and price—in view of the clear, explicit, direct, and cogent proofs to the contrary, which were introduced by complainant.

■ From the foregoing, our conclusion follows that price differentials based upon differences in potencies of the Vitamin A oil were, as far as appears from the evidence before us, established on a fallacious basis, and were unjustified by any relationship between potency and price. They were, accordingly, arbitrary classifications, and as such are invalid.

A judgment will be entered setting aside Section 1396.214(a) of Maximum Price Regulation 203 which fixes maximum prices for Vitamin A in accordance with the potency of the vitamin bearing oil.